UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

FLOODBREAK, LLC,

                                                Plaintiff,                        **OPINION & ORDER**

        v.                                                23-CV-6185
                                                      (Komitee, J.)

T. MORIARTY & SON, INC., and JAMES P.               (Marutollo, M.J.)
MORIARTY JR,

                                           Defendants.

------------------------------------------------------------------------x

**JOSEPH A. MARUTOLLO, United States Magistrate Judge:**

In this patent infringement action, Plaintiff Floodbreak, LLC alleges that Defendants T. Moriarty & Son, Inc. ("TMS") and James P. Moriarty, Jr. (collectively, "Defendants") directly infringed Plaintiff's U.S. Patent No. 9,752,342 (the "'342 Patent") by selling mechanical closure devices ("MCDs") to the New York Metropolitan Transit Authority ("MTA") and that Mr. Moriarty induced TMS's direct infringement. *See generally* Dkt. No. 36.

Currently before the Court are the parties' motions for construction of the disputed claims in the '342 Patent. *See* Dkt. Nos. 34, 41, 45; *see also* Dkt. Nos. 48, 51. Following a hearing before the undersigned pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996) on February 19, 2025 (*see* Text Order dated Feb. 19, 2025; Dkt. No. 68), the Court's constructions of the disputed terms are set forth below.[1]

---

[1] On December 12, 2024, the Honorable Eric R. Komitee, United States District Judge, referred the parties' respective claim construction briefs (*see* Dkt. Nos. 34, 41, 45; *see also* Dkt. Nos. 48, 51) to the undersigned to conduct the *Markman* hearing. Referral Order dated Dec. 12, 2024. At the February 19, 2025 *Markman* hearing, the parties consented to Magistrate Judge jurisdiction solely for the disposition of claim construction in the instant suit. *See* Dkt. No. 66, 67 ("The parties [] consent to have the assigned United States Magistrate Judge issue a ruling on all claim construction issues the parties raised in connection with the *Markman* hearing on February 19, 2025").

# I.    Background

## A.    Relevant Factual Background

On October 6, 2013, Plaintiff's founder, Louis A. Waters Jr., filed a "provisional patent application" with the U.S. Patent and Trademark Office ("USPTO") entitled "Flood Protection for Underground Air Vents."  Dkt. No. 36 ¶ 10.  Plaintiff, as Mr. Waters's assignee, amended that application and filed it "one year later as a nonprovisional patent application" with the USPTO. *Id.*  As set forth in the Complaint, Plaintiff explains that the invention subject to the patent "relates to innovative MCDs for blocking flood water from entering underground passages," the inspiration of which "came from the flooding of the New York City subway system after torrential rains and unprecedented storm surge defeated the ability of the system's powerful pumps to keep water above ground during Superstorm Sandy in October 2012." *Id.* ¶ 11.  According to Plaintiff, the MTA approved of the MCD designs and created plans "for mitigation of future flooding around [Plaintiff's] solution," which "required contractors to install [Plaintiff's] MCDs or substitute MCDs the MTA could 'approve' as 'equal' to the performance of [Plaintiff's] MCDs after the MTA conducted its own rigorous analysis and testing." *Id.* ¶ 13.

Between 2015 and 2016, Mr. Waters met with the Kevin Biebel, the CEO of a metal fabricator based out of Connecticut called Art Metal Industries, Inc. ("AMI"), to discuss "possible collaboration in fabrication and supply of MCDs." *Id.* ¶¶ 12-13.  AMI had previously "made, used, offered for sale, and sold MCDs for installation in ventilation ducts in the New York City subway system." *Id.* ¶ 12.  Rather than collaborating, Plaintiff asserts that AMI instead gained unauthorized access to Floodbreak's MCD designs and manufactured their own MCDs that allegedly infringed upon Plaintiff's designs. *Id.* ¶ 15.

2

In early 2016, Defendants, in their capacity as construction contractors, bid on "one of several contracts for installing flood-control devices in the New York City subway system," the work of which "primarily would involve obtaining, installing and selling MCDs to the MTA." *Id.* ¶ 16. Plaintiff contends that Defendants prepared their bid by relying "on the very low pricing on offer for MCDs from AMI." *Id.*

On April 7, 2016, the USPTO published Plaintiff's application for the '342 Patent. *Id.* ¶ 17.

On September 7, 2016, the MTA awarded Defendants with a contract to furnish and install MCDs in the subway system. *Id.* ¶ 19. Defendants, working with AMI, then attempted to obtain the MTA's approval for their MCDs as "equal" to Plaintiffs between 2016 and early 2017. *Id.* ¶¶ 21-23. Defendants' requests, however, were denied by the MTA. *Id.*

On June 9, 2017, Defendants sent the MTA a "Submittal Package" seeking approval of AMI's MCD design as "equal" to Plaintiff's for performance of the contract they were awarded. *Id.* ¶ 24. On August 14, 2017, the MTA approved the AMI MCDs. *Id.* "Three days later," Defendants "issued a purchase order for AMI to supply approximately 398 MCDs for eventual installation and sale to the MTA" under the contract. *Id.* ¶ 25. Plaintiff asserts these MCDs supplied by AMI to Defendants were the infringing devices based off Plaintiff's design drawings that AMI improperly obtained. *Id.* ¶¶ 14, 25.

On September 5, 2017, the USPTO granted Plaintiff's patent application and issued to it the '342 Patent. *Id.* at ¶ 26. Thereafter, Defendants began installing the AMI MCDs under the contract with the MTA. *Id.* ¶ 30. Plaintiff states that "[a]ll deliveries, installations, and sales of the approximately 398 infringing MCDs by [Defendants] to the MTA" occurred after issuance of the '342 Patent. *Id.* ¶ 26.

B.    **The Connecticut Litigation**

On March 26, 2018, Plaintiff filed suit against AMI and Mr. Biebel[2] in the United States District Court for the District of Connecticut for infringing the '342 Patent when it improperly obtained Plaintiff's MCD designs and furnished MCDs to the instant Defendants.  Dkt. No. 36 at ¶ 31; *see also Floodbreak, LLC v. Art Metal Indus., LLC*, No. 18-CV-504 (SRU) (D. Conn. 2018) (the "Connecticut Litigation").

Pertinent here, on July 8, 2019, the district court in the Connecticut Litigation ruled on the parties' claim construction arguments concerning three terms in the '342 Patent: "(1) 'stops,' as used in independent claims 1, 22, 23, and 24 of the '342 patent, (2) 'profile', as used in independent claims 1, 22, 23, and 24, and (3) 'gravitational rotation', as used in independent claims 23 and 24." *Floodbreak, LLC v. Art Metal Indus., LLC*, No. 3:18-CV-503 (SRU), 2019 WL 2929950, at *1 (D. Conn. July 8, 2019).  The district court determined that the terms "stops" and "profile" did not require construction because they had ordinary meaning to those skilled in the art.  *Id.*  The district court did, however, find that the term "gravitational rotation" required construction, and construed it as "[t]he panels are mounted to rotate from a higher place to a lower place and fall using the force of gravity to rotate the panels downwardly."  *Id.* at *6.

On July 21, 2022, the parties to the Connecticut Litigation "stipulated to the validity and enforceability of the '342 Patent," which specified that AMI, Mr. Biebel, and AMI's parent company "directly infringed and induced infringement of at least claims 1, 4-5, 8, 10, 14, and 20-24 of the '342 Patent by supplying MCDs to [Defendants]; that in doing so they acted willfully; and that their infringement damages [Plaintiff] in the amount of at least $17,811,202."  Dkt. No.

---

[2] As noted above, AMI and Mr. Biebel are not parties to the present action.

4

36 ¶ 34 (citation omitted).  The district court then entered final judgment on the stipulation in favor of Plaintiff in the Connecticut litigation.  *Id.* ¶ 35.

### C.    Relevant Procedural Background

On August 16, 2023, Plaintiff filed the instant suit alleging that Defendants infringed upon its patent, covering an invention that provides "flood protection for underground air vents."  Dkt. No. 36 at ¶ 1.  Specifically, Plaintiff contends that Defendants directly infringed upon its patent when it sold and offered to sell infringing MCDs produced by AMI to the MTA for installation in the New York City subway system after the USPTO had issued Plaintiff the '342 Patent.  *Id.* ¶¶ 12-13, 38-40.  Plaintiff further asserts a claim for inducement of infringement against Defendants, where Mr. Moriarty actively aided and abetted direct infringement by supervising, directing, participating in, and approving TMS's infringing activities.  *Id.* ¶¶ 41-44.

On May 6, 2024, an initial conference was held before the undersigned.  Minute Entry dated May 6, 2024.  At the conference, the parties were ordered to file the completed claim construction briefing by November 15, 2024, as well as to inform the Court whether a *Markman* hearing was necessary.  *Id.*

On October 1, 2024, Plaintiff filed its opening claim construction brief.  *See generally* Dkt. No. 34.  In its brief, Plaintiff argues that five terms and phrases Defendants assert require construction in the '342 Patent in fact have ordinary and customary meaning and thus do not require construction: (1) "upright home position"; (2) "impetus"; (3) "solely by gravitational impetus on its own weight" / "in gravitational rotation falling solely under the impetus of its own weight"; (4) "gravitational rotation" / "gravitationally rotate"; and (5) "profile."  Dkt. No. 34 at 2.[3] Plaintiff notes that the terms and phrases "impetus" and "gravitational rotation" / "gravitationally

---

[3] Unless otherwise stated, page citations are to the ECF-stamped pages on the docket.

rotate" may be exceptions, however, and offers alternative constructions should the Court find that they have no ordinary and customary meaning. *Id.* at 3, 9-16.

On November 1, 2024, Defendants filed their memorandum in opposition to Plaintiff's opening claim construction brief. *See generally* Dkt. No. 41. Defendants challenge Plaintiff's arguments raised in its opening brief and offers proposed constructions for each of the five terms addressed by Plaintiff. *Id.* at 13-24. Further, Defendants asserts that the following phrases in the '342 Patent are indefinite under 35 U.S.C. § 112(b): "not obstructing said passage" and "unobstructively horizontally spanning across said passage" as well as "an axis supported by and horizontally disposed within said support." *Id.* at 24-29.

On November 15, 2024, Plaintiff filed its reply in response to the arguments raised by Defendants in their November 1, 2024 brief. *See generally* Dkt. No. 45. Plaintiff's reply brief also asserts that the terms construed in the Connecticut Litigation, involving four of the five claims raised in the present suit, should be afforded substantial weight as Defendants have not offered a strong reason for departing from those constructions. *Id.* at 1-4 (citing *Floodbreak*, 2019 WL 2929950).

On December 6, 2024, the parties filed a joint letter indicating their desire to present arguments concerning claim construction at a *Markman* hearing. *See generally* Dkt. No. 48. In Defendants' portions of the joint letter, they made additional claim construction arguments in response to Plaintiff's reply brief. *Id.* at 3-5. Pursuant to its request, the undersigned permitted Plaintiff to file a sur-reply in response to those arguments raised by Defendants in the joint letter. *See* Dkt. No. 51.

On December 12, 2024, Judge Komitee referred the parties' requested *Markman* hearing to the undersigned. Referral Order dated Dec. 12, 2024.

6

On February 19, 2025, a *Markman* hearing was held on the record.  *See* Minute Entry dated Feb. 19, 2025; Dkt. No. 68 (containing transcript of hearing).  At the hearing, the parties stipulated to Plaintiff's alternative construction for the term "profile" in Claims 1, 22-24, meaning "the shape of the panel."  Dkt. No. 68 at 62-65.  The parties presented arguments using demonstrative slide decks but, at their election, did not offer live witness testimony.  *See generally id.*

After hearing argument from the parties' concerning construction of the disputed claims in the '342 Patent, the undersigned reserved ruling.  *Id.*  Additionally, the undersigned instructed the parties to indicate whether they would consent to Magistrate Judge jurisdiction for disposition of the entire case or for claim construction.  *Id.*

On February 28, 2025, the parties consented to Magistrate Judge jurisdiction for resolution of claim construction in the instant suit.  Dkt. No. 67.

### D.    The '342 Patent

The '342 Patent claims an MCD "that enables workers to close air vents in sidewalk grates to prevent flooding of a subway system."  Dkt. No. 34 at 1; Dkt. No. 31 at 12.  Plaintiff alleges infringement of Claims 1, 4, 5, 8, 10, 14, and 20-24 of the '342 Patent.  Dkt. No. 41 at 12; Dkt. No. 36 at ¶ 38.

Of those claims, the parties disagree as to the appropriate construction of the following terms and phrases in the '342 Patent: "upright home position" (Claims 1, 4, 22-24); "impetus" (Claims 1 and 22); "solely by gravitational impetus on its own weight" / "in gravitational rotation falling solely under the impetus of its own weight" (Claims 1 and 22); and "gravitational rotation" / "gravitationally rotate" (Claims 1, 22-24).  *Compare* Dkt. No. 34 at 5-14, *with* Dkt. No. 41 at 13-22; *see also* Dkt. No. 68 at 3-4.  Defendants further challenge the following phrases as indefinite: "not obstructing said passage" and "unobstructively horizontally spanning across said passage"

7

(Claims 1, 4, 8, 10, 22-24); and "an axis supported by and horizontally disposed within said support" (Claim 14).  Dkt. No. 41 at 24-29; *see also* Dkt. No. 68 at 4.

The Claims containing the disputed terms and phrases appear in the '342 Patent in full as follows:

1. Apparatus for allowing ventilation through a ventilation shaft to an underground ventilation duct fluidly communicating through the ventilation shaft to an atmospheric opening of the shaft and on threat of flooding operable to prevent downward flow of surface water into the underground ventilation duct, comprising:
> a support for arrangement in said shaft defining a passage between top and bottom openings of the support for fluid communication of said ventilation duct up through said support to said atmospheric opening,
> one or more stops within and connected to said support proximate said bottom opening and **not obstructing said passage**,
> one or more panels mounted in said support for rotation upwardly to an **upright home position not obstructing said passage** and rotation downwardly from said **upright home position solely by gravitational  impetus on its own weight** to a lower passage closing position where further rotation is prevented by said one or more stops, said one or more panels having a profile that closes said passage when said one or more panels **gravitationally rotate** to said passage closing position, and
> a panel holder having one or more moveable members holding the one or more panels in said **upright home position** and having a handle operable to move said one or more moveable members to release the hold of the one or more panels and allow the one or more panels to rotate downwardly **solely by gravitational impetus on its own weight** to said passage closing position.

4. The apparatus of claim 1 compromising a pair of said panels mounted centrally in said passage for rotation of the panels in directions opposite each other from or to said **upright home position not obstructing said passage**, in gravitational rotation falling from said **upright home position** to said lower passage closing position.

8. The apparatus of claim 1 in which said holder comprises a latch for each said one or more panels, each latch having a said moveable member, each said latch being positioned to hold said panels upright in said home position, each said moveable member being moveable to free said hold on a said panel held in said upright home position to allow the panel to gravitationally rotate from said upright home position to said passage closing position.

10. The apparatus of claim 8 comprising a beam **unobstructively horizontally spanning across said passag**e and connected to opposed sides of said support proximate said top opening.

14. The apparatus of claim 1 in which said one or more panels is hingedly rotatable on **an axis supported by and horizontally disposed within said support**.

22. Apparatus for allowing ventilation through a ventilation shaft to an underground ventilation duct fluidly communicating through the ventilation shaft to an atmospheric opening of the shaft and on threat of flooding operable to prevent downward flow of surface water into the underground ventilation duct, comprising:

   a support for arrangement in said shaft defining a passage between top and bottom openings of the support for fluid communication of said ventilation duct up through said support to said atmospheric opening,

   one or more stops within and connected to said support proximate said bottom opening and **not obstructing said passage**,

   one or more panels mounted in said support for rotation of the one or more panels from or to an **upright home position not obstructing said passage**, **in gravitational rotation falling solely under the impetus of its own weight** from said **upright home position** to a lower passage closing position where further rotation is prevented by said one or more stops, said one or more panels having a profile that closes said passage when said one or more panels **gravitationally rotate** to said passage closing position, and

   a latch for each said one or more panels engageable to hold the one or more panels in said **upright home position** and releasable to release the home position hold of the one or more panels and allow the one or more panels to **gravitationally rotate** downwardly to said passage closing position.

23. Apparatus for allowing ventilation through a ventilation shaft to an underground ventilation duct fluidly communicating through the ventilation shaft to an atmospheric opening of the shaft and on threat of flooding operable to prevent downward flow of surface water into the underground ventilation duct, comprising:

   a support for arrangement in said shaft defining a passage between top and bottom openings of the support for fluid communication of said ventilation duct up through said support to said atmospheric opening,

   one or more stops within and connected to said support proximate said bottom opening and **not obstructing said passage**,

   one or more panels mounted in said support for rotation of the one or more panels from or to an **upright home position not obstructing said passage**, in **gravitational rotation** falling from said **upright home position** to a lower passage closing position where further rotation is prevented by said one or more stops, said one or more panels

9

having a profile that closes said passage when said one or more panels **gravitationally rotate** to said passage closing position, and

a panel holder having one or more moveable members holding the one or more panels in said **upright home position** and having a handle operable solely by human action to move said one or more moveable members to release the hold of the one or more panels and allow the one or more panels to **gravitationally rotate** downwardly to said passage closing position.

24. Apparatus for allowing ventilation through a ventilation shaft to an underground ventilation duct fluidly communicating through the ventilation shaft to an atmospheric opening of the shaft and on threat of flooding operable to prevent downward flow of surface water into the underground ventilation duct, comprising:

a support for arrangement in said shaft defining a passage between top and bottom openings of the support for fluid communication of said ventilation duct up through said support to said atmospheric opening,

one or more stops within and connected to said support proximate said bottom opening and **not obstructing said passage**,

one or more panels mounted in said support for rotation of the one or more panels from or to an **upright home position not obstructing said passage**, in **gravitational rotation** falling from said **upright home position** to a lower passage closing position where further rotation is prevented by said one or more stops, said one or more panels having a profile that closes said passage when said one or more panels **gravitationally rotate** to said passage closing position, and

a latch for each said one or more panels engageable to hold the one or more panels in said **upright home position** and releasable by human action to release the home position hold of the one or more panels and allow the one or more panels to **gravitationally rotate** downwardly to said passage closing position.

Dkt. No. 34-7 at 27-29 (containing copy of the '342 Patent) (emphases added).

## II.   <u>Legal Standards</u>

### A.   **Claim Construction**

"Claim construction is an issue of law decided by the Court." *Trove Brands LLC v. Jia Wei Lifestyle Inc.*, No. 24-CV-3050 (PAE), 2025 WL 1409558, at *2 (S.D.N.Y. May 15, 2025) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370). "In patent law, as in all statutory construction, [u]nless otherwise defined,

words will be interpreted as taking their ordinary, contemporary, common meaning." *Bilski v. Kappos*, 561 U.S. 593, 603 (2010) (cleaned up).

"Courts have observed that '[c]laim construction is the single most important event in the course of a patent litigation' as it 'defines the scope of the property right being enforced, and is often the difference between infringement and non-infringement, or validity and invalidity.'" *Certicable LLC v. Point 2 Point Commc'ns Corp.*, No. 23-CV-5322 (NJC) (SIL), 2025 WL 1220604, at *4 (E.D.N.Y. Mar. 11, 2025) (quoting *Radiancy, Inc. v. Viatek Consumer Prods. Grp., Inc.*, No. 13-CV-3767 (NSR) (LMS), 2015 WL 221063, at *2 (S.D.N.Y. Jan. 14, 2015)). "A 'district court's duty at the claim construction stage is, simply[] to resolve a dispute about claim scope that has been raised by the parties.'" *Artec Eur. S.À.R.L. v. Shenzhen Creality 3D Tech. Co.*, No. 22-CV-1676 (OEM) (VMS), 2024 WL 4479810, at *1 (E.D.N.Y. Oct. 11, 2024) (quoting *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016)). Claim construction thus serves to "define terms so that a jury may be properly instructed." *Allele Biotechnology & Pharms., Inc. v. Regeneron Pharms., Inc.*, No. 20-CV-8255 (PMH), 2022 WL 17417291, at *3 (S.D.N.Y. Dec. 5, 2022) (citing *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004)).

To determine the meaning of claims in a patent, courts look "first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Trove Brands LLC*, 2025 WL 1409558, at *2 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "It is a bedrock principle of patent law that claims of a patent define the scope of a patented invention and the patentee's right to exclude." *Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1054 (Fed. Cir. 2024); *Artec Eur. S.À.R.L.*, 2024 WL 4479810, at *1 (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en*

*banc*)).  "Courts construe claims in order to resolve ambiguities and to assign meaning to claims so that a patentee's right to exclude is clearly defined."  *Floodbreak*, 2019 WL 2929950, at *2 (quoting *Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004)).  "Claim construction 'begins and ends in all cases with the actual words of the claim.'"  *Hayden AI Techs., Inc. v. Safe Fleet Holdings LLC*, No. 23-CV-3471 (EK) (JRC), 2024 WL 1018589, at *3 (E.D.N.Y. Mar. 9, 2024) (Komitee, J.) (quoting *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1375 (Fed. Cir. 2017)).  "Claim terms are generally given their 'ordinary and customary meaning,' which is the meaning one of ordinary skill in the art would ascribe to a term at the time of the invention, when read in context of the claim and specification."  *Nike, Inc. v. Lululemon USA Inc.*, No. 23-CV-771 (AS), 2023 WL 9003708, at *1 (S.D.N.Y. Dec. 28, 2023) (quoting *Phillips*, 415 F.3d at 1313). "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."  *Id.* (quoting *Apple Inc. v. MPH Techs. Oy*, 28 F.4th 254, 259 (Fed. Cir. 2022)).   The Federal Circuit has made clear that "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  *Eon Corp. IP Holdings*, 815 F.3d at 1318 (citations omitted).

As aptly explained by then-district Judge Joseph F. Bianco in a 2016 claim construction decision, affirmed by the Court of Appeals for the Federal Circuit:

> In construing the claim language, the court must begin with the principle that "the words of a claim 'are generally given their ordinary and customary meaning.'" (*Phillips*, 415 F.3d at 1312 (quoting *Vitronics*, 90 F.3d at 1584)).  This ordinary and customary meaning "is the meaning that the [claim] term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  *Id.* at 1313. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.*

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. "In such circumstances general purpose dictionaries may be helpful." *Id.* In other cases, "determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art." *Id.* In those cases, "the court looks to those sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean." *Id.* (internal quotation marks and citation omitted). These sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.*

When the specification reveals a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, the inventor's lexicography governs. *Id.* at 1316. Nevertheless, it is improper to read limitations from the specification into the claim. *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1368 (Fed. Cir. 2005) ("'[I]f we once begin to include elements not mentioned in the claim, in order to limit such claim . . . we should never know where to stop.'" (quoting *Phillips*, 415 F.3d at 1312)). Thus, the court "do[es] not import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment, unless the specification makes clear that 'the patentee . . . intends for the claims and the embodiments in the specification to be strictly coextensive.'" *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) (internal citations omitted).

*Easyweb Innovations, LLC v. Twitter, Inc.*, No. 11-CV-4550 (JFB) (SIL), 2016 WL 1253674, at *5-*6 (E.D.N.Y. Mar. 30, 2016), *aff'd*, 689 F. App'x 969 (Fed. Cir. 2017); *see also Seoul Semiconductor Co. v. Satco Prods., Inc.*, 570 F. Supp. 3d 59, 60-61 (E.D.N.Y. 2021) (citing same "cogent, thorough description of the applicable standard for a *Markman* hearing").

## B.    Indefiniteness Under 35 U.S.C. § 112(b)

Section 112(b) of Title 35 "requires that a patent specification 'conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.'" *Sonix Tech. Co. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) (quoting 35 U.S.C. § 112(b)). "A claim fails to satisfy this statutory requirement and is

thus invalid for indefiniteness if its language, when read in light of the specification and the prosecution history, 'fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention.'" *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1369-70 (Fed. Cir. 2014) (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014)).

The requirement of Section 112 "strikes a 'delicate balance' between 'the inherent limitations of language' and providing 'clear notice of what is claimed.'" *Sonix Tech. Co.*, 844 F.3d at 1377 (quoting *Nautilus*, 572 U.S. at 909). But "absolute precision is unattainable," and "the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject matter." *Id.* (citing *Nautilus*, 572 U.S. at 909).

"[I]ndefiniteness is a question of law and in effect part of claim construction," *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012), and thus requires application of "general principles of claim construction." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 (Fed. Cir. 2015). "Any fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence." *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1228 (Fed. Cir. 2016) (quoting *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003)).

## III.   Discussion

### A.   Stipulated Terms

At the February 19, 2025 *Markman* hearing, the parties stipulated to construction of the term "profile" which had previously been disputed in the parties' claim construction briefing. *See* Dkt. No. 68 at 5-6, 62-65. After initially stating that the term needed to be construed, the parties agreed to construe the phrase "profile" using Plaintiff's proposed alternative definition, meaning "the shape of a panel." *Id.* at 65 (containing excerpt of Defendants' Counsel accepting construction

of "profile" using Plaintiff's alternative definition, to wit, "We will go with [Plaintiff's]. We will go with the shape of the object"); *see also* Dkt. No. 34 at 14 (proposing the term "profile" to mean "the shape of a panel" in the alternative). And even if the parties did not stipulate to a construction, the Court finds that the term has a plain an ordinary meaning not requiring additional construction. *See Seoul Semiconductor Co.*, 570 F. Supp. at 64 (explaining that several disputed terms "simply do not require construction by the Court" in finding that they had ordinary meanings).

In light of the parties' agreement, and given its plain and ordinary meaning, the Court construes the term "profile," as it appears in Claims 1, 22, 23, and 24 of the '342 Patent, as "the shape of a panel."

**B.    "Upright Home Position"**

The parties dispute construction of the phrase "upright home position" as it appears in Claims 1, 4, 22-24 of the '342 Patent. Plaintiff contends that the "phrase has an ordinary and customary meaning and therefore does not require construction." Dkt. No. 34 at 7. Defendants dispute that the phrase has an ordinary and customary meaning and propose that "upright home position" should be construed as "the approximately vertical orientation of a panel when it is being held in the open position." Dkt. No. 41 at 14. For the following reasons, the Court finds that "upright home position" as it appears in Claims 1, 4, and 22-24 of the '342 Patent has an ordinary and customary meaning.

"Words of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the art after reviewing the intrinsic record at the time of the invention." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting *Phillips*, 415 F.3d at 1312-13). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent

event to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. (citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001)). "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.

Defendants' proposed construction of the phrase seeks to qualify the language, construing "upright home position" as "the approximately vertical orientation of a panel when it is being held in the open position." Dkt. No. 41 at 14. But construing the phrase to include the words "held in the open position" muddies the phrase and requires the employment of latches, which is contrary to the '342 Patent's specification. As the specification of the '342 Patent explains, "the panel holder latch members extend below the beam and straddle the panels and hold them in the upright home position," and the "the upright home position of the panels tucks the panels under the beam free from pedestrian causal view through the atmospheric opening typically covered by a grate over the opening." Dkt. No. 34-7 at 24. The specification continues that "[e]ach latch member is moveable to free its hold on a panel to allow the panel to rotate from upright to the horizontal position." *Id.*; *see also* Dkt. No. 68 at 39-43.

Critically, the specification is explicit that the presence of latches is not required for the panels to be in an "upright home position." Indeed, the specification explains that the latches have properties that enable "panels [] to pass by latch members [] and [] attain their upright home position, which when attained, *allows* the spring biased latch members [] to re-extend the latch members to hold the panels in the home position." Dkt. No. 34-7 at 25 (emphasis added and figure citations removed). Thus, the "upright home position" permits the latches to descend, which then

16

hold the panel in that orientation. Whether those latches are actually engaged has no bearing on whether the panels can be held in that position in the first place.

Furthermore, Defendants' proposed replacement of the word "upright" with "approximately vertical orientation" instills additional confusion, as underscored by Defendants' emphasis on the phrase's temporal aspects. *See* Dkt. No. 68 at 41-43 (explaining that the phrase "upright home position" involves temporal proximity and questioning how the proposed language would be helpful to the jury). As known in 2013, the word "approximate" means "very near, in position or character," "not completely accurate but close," or "to bring near or close." *See Approximate*, The Oxford English Dictionary 589 (2d ed. 1989); *Approximate*, Cambridge Essential English Dictionary 19 (2d ed. 2011); *Approximate*, Merriam-Webster's Collegiate Dictionary 61 (11th ed. 2003).[4] Construing Defendants' proposal in the context of the specification, the proposed language "the approximately vertical orientation" fails to precisely state *when* and *where* the panel is positioned in between the upright (or vertical) and horizontal positions: it could be while the latches hold the panel when it is vertically aligned, or it could also be after the latches release while the panel swings and is *approximately* vertically aligned. But the proposed language that the panel be "held in the open position" directly contradicts the "approximate" nature of Defendants' proposed definition, as engagement of the latches requires

---

[4] As the effective filing date of the '342 Patent is in 2013 (Dkt. No. 36 ¶ 10), "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1383, n.3 (Fed. Cir. 2008). The Court notes, however, that definitions of the word did not change depending on the version of the dictionary utilized, including with respect to the present definitions of the word. *See Approximate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/approximate#h1 (last visited Aug. 21, 2025); *see also Approximate*, Dictionary.com, https://www.dictionary.com/browse/approximate (last visited Aug. 21, 2025) ("nearly exact; not perfectly accurate or correct"); *Approximate*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/approximate (last visited Aug. 21, 2025) ("not completely accurate but close").

that the panels be fully vertical.  Defendants' construction, when using dictionary definitions, thus violates the requirement that extrinsic evidence cannot "contradict the import of other parts of the specification."  *See Vitronics*, 90 F.3d at 1584.

Instead, "upright home position" when viewed in light of ordinary dictionary definitions provides the best construction.  *See Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent event to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").

Dictionaries define the adjective "upright" as having a consistent and similar meaning, including something that is "straight up or vertical," "vertically upward," "perpendicular," "erect on feet or end," and "perpendicular to the ground or other surface."  *See, e.g.*, *Upright*, Cambridge Essential English Dictionary 435 (2d ed. 2011); *Upright*, Merriam-Webster's Collegiate Dictionary 1375 (11th ed. 2003); *Upright*, The Oxford English Dictionary 310 (2d ed. 1989).  The word "home" in the context of the full phrase also has a consistent definition, meaning "a place of origin," a "seat," "centre," or place where a thing is native," an "ultimate position," and a "place of origin."  *See, e.g.*, *Home*, Merriam-Webster's Collegiate Dictionary 594 (11th ed. 2003); *Home*, The Oxford English Dictionary 323, 326 (2d ed. 1989). "Position" similarly has a common meaning, including "an arranging in order," "a certain arrangement of bodily parts," "the point or area occupied by a physical object," and "the manner in which a body as a whole [] are disposed or arranged."  *See, e.g.*, *Position*, The Oxford English Dictionary 165 (2d ed. 1989); *Position*, Merriam-Webster's Collegiate Dictionary 968 (11th ed. 2003); *see also Position*, Cambridge Essential English Dictionary 306 (2d ed. 2011) ("the place where [] something is").

Here, reading the words "upright home position" in conjunction with the above dictionary definitions and in the context of the specification and the surrounding claim language, the Court finds that the phrase is straightforward and requires no further construction. *See Seoul Semiconductor Co.*, 570 F. Supp. 3d at 64 (construing multiple phrases under their ordinary meanings); *O2 Micro*, 521 F.3d at 1362 ("Claim construction 'is not an obligatory exercise in redundancy'" (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997))). Defendants' proposed construction contains impermissibly limiting language, in violation of the Federal Circuit's instruction not to "read unstated limitations into claim language." *See Rambus Inc. v. Infineon Techs AG*, 318 F. 3d 1081, 1088 (Fed. Cir. 2003). The Court thus rejects Defendants' narrow construction.

Accordingly, the phrase "upright home position" as contained in Claims 1, 4, and 22-24 of the '342 Patent does not require further construction from its ordinary and customary meaning

## C.    "Impetus"

The parties dispute construction of the word "impetus" as it appears in Claims 1 and 22 of the '342 Patent. Plaintiff asserts that it should be construed to mean "force," while Defendants offer "cause of motion." Dkt. No. 34 at 7; Dkt. No. 41 at 14. The parties both acknowledge that the specification does not shed light on to construction of the term as "impetus" is not defined in the '342 Patent. Dkt. No. 34 at 7; Dkt. No. 41 at 15. The Court agrees. A review of the entire patent reveals that the word "impetus" only appears in the claim language but is otherwise absent from the written description and specification. Where "intrinsic evidence is silent as to the plain meaning of a term, it is entirely appropriate for the district court to look to dictionaries or other extrinsic sources for context—to aid in arriving at the plan meaning of a claim term." *Helmsderfer*, 527 F.3d at 1382.

The crux of the parties' disagreement thus rests on the proper definition of the word in its ordinary and customary meaning for a person skilled in the art at the time the patent was filed. Dkt. No. 34 at 7 (contending that "impetus" has an ordinary and customary meaning); Dkt. No. 41 at 15 (citing to dictionary definitions in construing "impetus"). Specifically, Plaintiff argues that "impetus" means "*a* force' that impels movement of the panels." Dkt. No. 45 at 6-7 (emphasis added). Plaintiff argues that impetus means "a" cause of motion rather than "the" cause of motion, as a force can be one of any number of causes of motion. *See* Dkt. No. Dkt. No. 34 at 7-8; Dkt. No. 45 at 6-7; Dkt. No. 68 at 48 ("In common parlance, we talk about, [] the impetus of the donation resulted in the part being built. [I]s that all that caused the part to be built? There are many other things that must happen for the part to be built. And that's what 'impetus' means."). Defendants, in contrast, counter that the word should be construed as *the* driving or moving force or cause. Dkt. No. 41 at 15-16.

Dictionary definitions available in 2013 do not resolve the dispute. Merriam-Webster defines "impetus" as "a driving force, and the second definition in the Oxford English Dictionary defines it, when "in reference to immaterial things, as feelings, actions, etc.," as "[m]oving force, impulse, stimulus." *See Impetus*, Merriam-Webster's Collegiate Dictionary 624 (11th ed. 2003); *Impetus*, The Oxford English Dictionary 718 (2d ed. 1989). The first definition in the Oxford English Dictionary, however, supports Defendants' proposed language, defining "impetus" as "[t]he force which a body moves or maintains its velocity and overcomes resistance[.]" *Impetus*, The Oxford English Dictionary 718 (2d ed. 1989).

The Court agrees with Plaintiff that "impetus" means "a" force or cause and not "the" driving force or cause. The claim language conveys that the panels must be mounted in a way that permits the panels to fall entirely through gravity by its own weight. *See* Dkt. No. 34-7 at 27-28

20

(containing Claims 1 and 22 in full).  It does not follow, however, that the claim language precludes other forces from driving the panels to fall as well.

For example, as discussed at the *Markman* hearing (Dkt. No. 68 at 49-55), rainwater or wind could cause the panels to reach a state where the panel's own weight then takes over and gravity forces the panel to its horizontal position.  Under such circumstances, Defendants' assertion, that gravity is the *only* force that can cause the panel to rotate, would be incorrect.  The claim language *requires* that the panels be able to fall solely under their own weight, but it does not *exclude* other forces from also causing downward rotation.  The Court therefore cannot read Defendants' limitations into the patent that are not supported by the claim language. *See Rambus*, 318 F. 3d at 1088 (prohibiting courts from "read[ing] unstated limitations into claim language").

Furthermore, Plaintiff's interpretation of "impetus" is supported by the claim construction decision in the Connecticut Litigation.  In examining the '342 Patent's language, the court adopted Plaintiff's construction that the claims "allow *either* the release to move the panels sideways to initiate gravitational force, *or some other force* would be permitted to move it sideways to get it to the point where gravity would allow it to fall."  *Floodbreak*, 2019 WL 2929950, at *6 (emphasis added).  The Court finds the well-reasoned claim construction ruling in the Connecticut Litigation persuasive to construction of the instant term.  *See Paone v. Broadcom Corp.*, No. 15-CV-0596 (BMC) (GRB), 2015 WL 4988279, at *5 n.5 (E.D.N.Y. Aug. 19, 2015) ("Prior claim construction rulings involving the same patent, even when they are entitled to preclusive effect, will serve as persuasive authority" (internal quotations and citations omitted)); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 329 (2015) ("[prior cases construing the same claim] . . . sometimes will serve as persuasive authority"); *Canon Inc. v. GCC Int'l Ltd.*, 450 F. Supp. 2d 243, 250

(S.D.N.Y. 2006), *aff'd*, 263 F. App'x 57 (Fed. Cir. 2008) (concluding that a separate court's interpretation applied to the claim construction in the case at bar).[5]

Accordingly, the Court adopts Plaintiff's construction of the word "impetus" in Claims 1 and 22 to mean "a force or cause" in the '342 Patent.

### D. "Solely By Gravitational Impetus On Its Own Weight" / "In Gravitational Rotation Falling Solely Under The Impetus Of Its Own Weight"

The parties next dispute the phrases "solely by gravitational impetus on its own weight" and "in gravitational rotation falling solely under the impetus of its own weight," appearing in Claims 1 and 22 of the '342 Patent. Plaintiff avers that the phrases should be construed in accordance with their ordinary and customary meanings. Dkt. No. 34 at 8. Defendants disagree and propose that the phrases mean "the weight of a panel and gravity are the only causes of motion." Dkt. No. 41 at 18.

Here, and in light of the Court's discussion and adoption of Plaintiff's definition for "impetus" above, no further construction for the remaining terms is necessary. In line with Plaintiff's position, the Court therefore finds that "solely by gravitational impetus on its own weight" and "in gravitational rotation falling solely under the impetus of its own weight" have ordinary and customary meanings when read with the Court's construction of "impetus" and in the context of the '342 Patent.

Defendants proposed construction, pursuant to their proposed language for "impetus," would limit the claim such that gravity can be the only force or cause moving the panels. But as explained above, that limitation is not apparent in the language of the claims, and it is at odds with the persuasive claim construction ruling in the Connecticut Litigation. *See Floodbreak*, 2019

---

[5] The Court notes that it does not find the Connecticut Litigation's claim construction ruling binding upon the claim construction ruling presently at issue.

2929950, at *6.  The Court will thus not read-in such limitations to Claims 1 and 22 that simply do not appear in the language and that conflict with prior determinations.  *See Rambus*, 318 F. 3d at 1088 (prohibiting courts from "read[ing] unstated limitations into claim language"); *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1290 (Fed. Cir. 2000) ("This court has repeatedly and clearly held that it will not read unstated limitations into claim language."); *Paone*, 2015 WL 4988279, at *5 n.5 (explaining that substantial weight should be afforded to prior constructions of claims in the same patent).

Defendants attempt to support their construction by citing to the prosecution history of the '342 Patent, contending that Plaintiff's addition of the phrase "solely by gravitational impetus on its own weight" to Claim 1 "by amendment to overcome the PTO Examiner's rejections based on prior patents," and that the phrase "in gravitational rotation falling solely under the impetus of its own weight" was thereafter added to Claim 22 "in order to obtain an additional claim [] that includes this same concept as in Claim 1."  Dkt. No. 41 at 17.  Although it is true that prosecution history "may be given substantial weight in construing a term where that term was added by amendment," *see Bd. of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1369 (Fed. Cir. 2008); *see also Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1333 (Fed. Cir. 2003) ("In this case, the [claim phrases at issue] were added to gain allowance of the claims. . . . We must therefore give them weight, for the patentability of the claims hinged upon their presence in the claim language."), Defendants' citation to the prosecution history is inapposite.

The prosecution history does not support Defendants' claim that "the weight of the panel and gravity are the only causes of motion."  The amendment to the '342 Patent dated October 6, 2014 reveals that Claim 1 was amended to include the phrase "solely by gravitational impetus on

23

its own weight" to articulate that the '342 "is designed for 'active' human intervention when there is advance warning of a serious storm event," rather than prior art that was "designed to passively and automatically guard against sudden flooding events."  Dkt. No. 34-12 at 215 (containing prosecution history of the '342 Patent).  Specifically, the phrase "solely by gravitational impetus of its own weight" was included to illustrate that the panel could move downward by its own weight, as opposed to prior art that closed "solely by the weight of water captured in reservoir[.]" *Id.* at 216.

Nothing in the prosecution history of Claim 1 suggests that the phrase was intended to preclude other forces besides "gravitational impetus" to cause the panel to descend.  Indeed, the USPTO's "Applicant-Initiated Interview Summary" bolsters this reading, conveying in "substance of interview section" that Plaintiff and the Examiner discussed: "the difference between [the '342 Patent] closing by gravitational impetus due to weight and prior art closing passively when water fills reservoir while held against gravity counterweight." *Id.* at 248.  The parties further discussed "potential amendment to [Claim 1] to include language clarifying closure by weight due to gravity," which the Examiner anticipated "would appear to overcome prior art." *Id.*  Thus, the prosecution history shows that inclusion of the phrase "solely by gravitational impetus on its own weight" was included in the amendment to clarify that the panels in the '342 Patent were moved by actively triggering the panels via human intervention rather than passive triggering of the panels through an influx of water.  It does not support Defendants' language that gravity is the only way for the panels close.

In sum, the prosecution history does not support a construction of the phrase that "closure by weight due to gravity" is the *only* force that enables movement of the panel.  Given that Defendants concede that the phrase "in gravitational rotation falling solely under the impetus of

24

its own weight" in Claim 22 "includes this same concept as in Claim 1," and because the phrases were added through the same amendment, the prosecution history of Claim 1 applies to Claim 22. *See Jansen*, 342 F.3d at 1334 (reading together phrases that were added simultaneously to overcome the same rejection by the Examiner).

Accordingly, the Court agrees with Plaintiff that the phrases "solely by gravitational impetus on its own weight" and "in gravitational rotation falling solely under the impetus of its own weight," appearing in Claims 1 and 22 of the '342 Patent, have ordinary and customary meaning when read with the Court's construction of "impetus" and the '342 Patent.

### E.    "Gravitational Rotation" / "Gravitationally Rotate"

Turning to the next dispute, the parties disagree about the construction of the phrases "gravitational rotation" and "gravitationally rotate" as they appear in Claims 1, 22, 23, and 24. Plaintiff alleges that the phrases "have an ordinary and customary meaning and therefore do not require construction." Dkt. No. 34 at 9. Plaintiff alternatively proposes the terms mean "the panels are mounted to rotate from a higher place to a lower place and fall using the force of gravity to rotate the panels downwardly." *Id.* at 13. Defendants reject Plaintiff's contention and assert that the phrases mean "movement around an axis caused by the force of gravity." Dkt. No. 41 at 22.

Defendants' proposed language, "caused by the force of gravity," would limit the claims such that gravity would be the only force triggering movement of the panels. Defendants argue that adjective and adverb forms of "gravitational" and "gravitationally" modifying "rotation" and "rotate," respectively, require that gravity be the only cause of movement. But as explained above, Defendants' construction impermissibly imputes limitations that do not appear in the patent. Although gravity can indeed cause movement in the panels, it is not a necessary presence for such movement in the first place.

The district court in the Connecticut Litigation expounded on this point with respect to the phrase "gravitational rotation." *See Floodbreak*, 2019 WL 2929950, at *5.   As raised by Plaintiff here, the district court in the Connecticut Litigation noted that "during patent prosecution, the applicants were very careful to distinguish their reasons for patentability of Claims 23 and 24 versus the reasons for patentability of Claims 1 and 22." *Id.*; *see* Dkt. No. 34 at 11 (explaining the same).  The district court highlighted the differentiation of the claims, citing to the October 6, 2014 amendment that "differentiated between flood prevention by gravity and flood prevention by human action in Claims 1 versus Claims 23 and 24." *Floodbreak*, 2019 WL 2929950, at *5.

Invoking principles of claim differentiation, including the presumption that different words or phrases used in separate claims indicate that the claims have different meaning and scope (*id.* at *6 (citing *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999))), and that "the use of a term in one claim can help demonstrate the meaning of that term in another claim, and differences among claims can also guide understanding" (*id.* (quoting *Clearwater Sys. Corp. v. Evapco, Inc.*, 553 F. Supp. 2d 173, 176 (D. Conn. 2008))), the district court explained:

> Although Floodbreak narrowed the scope of claim 1 in its 2016 proposed amendment, it did not do so for claims 23 and 24, and therefore AMI's suggested meaning of the term "gravitational rotation" cannot be applied generally throughout the patent. In addition, the "gravitational" language in claim 1 differs greatly from the language in claims 23 and 24. In claim 1, the panels are mounted for rotation upwardly to a home position "and rotation downwardly . . . *solely* by gravitational impetus on its own weight to a lower passage closing position." Claim 22 also uses the word "solely" regarding downward rotation of the panels: "in gravitational rotation falling *solely* under the impetus of its own weight . . . to a lower passage closing position." Claims 23 and 24 do not use the term "solely" or "only." Accordingly, one of ordinary skill in the art would not incorporate "only" in the definition of the phrase at issue.

*Floodbreak*, 2019 WL 2929950, at *6 (citations omitted).

As noted by the district court in the Connecticut Litigation, the prosecution history of the '342 Patent does not support Defendants' argument here that gravity is the only force that can cause the panels to move in Claims 23 and 24.

On this same basis, the district court in the Connecticut Litigation likewise rejected the argument, raised by Defendants here (Dkt. No. 41 at 20-21), that the PTO Examiner determined that phrase "solely by gravitational impetus" was imputed to all claims. Rather, "the language used by the applicants in the amendment demonstrates that different kinds of force are meant to be used in specific patent claims." *Floodbreak*, 2019 WL 2929950, at *6.

In sum, the Court is persuaded by the district court's construction of the phrase in the Connecticut Litigation. Indeed, the undersigned agrees that the phrases "gravitational rotation" and "gravitationally rotate," as contained in Claims 1, 22, 23 and 24, supports a construction that the claims "would allow either the release to move the panels sideways to initiate gravitational force, or some other force would be permitted to move it sideways to get it to the point where gravity would allow it to fall." *Id.* The Court finds the district court's claim construction ruling in the Connecticut Litigation on the phrase "gravitational rotation" in the '342 Patent persuasive and supports the Court's similar finding in the instant dispute. *Paone*, 2015 WL 4988279, at *5 n.5; *Teva Pharms.*, 574 U.S. at 329.

The Court therefore adopts Plaintiff's construction of the phrases "gravitational rotation" and "gravitationally rotate" to mean "the panels are mounted to rotate from a higher place to a lower place and fall using the force of gravity to rotate the panels downwardly" as contained in Claims 1, 22, 23, and 24 of the '342 Patent.

**F.      Indefiniteness**

In their responsive claim construction brief, Defendants challenge three phrases for indefiniteness under 35 U.S.C. § 112(b): the phrases "not obstructing said passage" and "unobstructively horizontally spanning across said passage" as they appear in Claims 1, 4, 8, 10, 22, 23, and 24; and the phrase "an axis supported by and horizontally disposed within said support" in Claim 14.  Dkt. No. 41 at 24-29.  Plaintiff disputes that the phrases lack definiteness, proposing that they be construed pursuant to plain and ordinary meanings.  Dkt. No. 45 at 9-10.

> i.    **"Not Obstructing Said Passage" / "Unobstructively Horizontally Spanning Across Said Passage"**

Defendants assert that the phrases in the '342 Patent's claims do not have a plain and ordinary meaning.  Dkt. No. 41 at 26.  Defendants thus request that the Court construe the terms as "not obstructing any airflow in said passage" in Claims 1, 4, 8, 10, 22, 23, and 24, or otherwise invalid under 35 U.S.C. § 112(b).  Plaintiff counters that the phrases need no construction as they have ordinary and customary meaning.  Dkt. No. 45 at 9-10.

Here, the phrases as they appear in the '342 Patent are not indefinite under 15 U.S.C. § 112(b).   As indefiniteness is a question of law and "in effect a part of claim construction," *ePlus, Inc.*, 700 F.3d at 517, the Court employs "general principles of claim construction" in evaluating the phrases.  *See Biosig Instruments*, 783 F.3d at 1377.

Evaluating the language of the specification reveals a pertinent explanation of the phrase. Two passages of the specification explain what "unobstructively" means in the context of the claims.

Column 6 at lines 57-61 reads:

Each panel has a proximal and distal portion, and each moveable hinge member attaches to the proximal portions of each panel. *By unobstructively is meant that the hinge mounting member does not block movement of air though the passage.*

28

Dkt. No. 34-7 at 23 (emphasis added).  Lines 62-66 of Column 6 in the specification similarly references support beams in the same context:

> In an exemplary embodiment a beam unobstructively horizontally spans across the support passage and connects to opposed sides of the support proximate the top opening. *By unobstructively is meant that the beam does not block movement of air though the passage.*

*Id.* (emphasis added).

Following the Federal Circuit's instruction that a patent's specification "is the single best guide to the meaning of a disputed term," *Vitronics*, 90 F.3d at 1582, the context provided in the above passage of the specification that the state of "not obstructing" and "unobstructively" is when the movement of air is not blocked in the passage of the device by moveable hinge members or beams.  The proper construction of the terms is therefore "not obstructing airflow in said passage" as they appear in Claims 1, 4, 8, 10, 22, 23, and 24 of the '342 Patent.

Defendants' proposed construction seeks to limit the Court's determination further, arguing that the phrase must be construed as "not obstructing *any* airflow in said passage."  Dkt. No. 41 at 27.  The district court in the Connecticut Litigation rejected a variation of that argument, as aptly explained below in its decision denying AMI's motion for summary judgment on Plaintiff's patent infringement claim:

> Both the beam and hinge mount mounting member are described as "unobstructively" spanning across the passage. As was the case with the stops, the beam and hinge mount mounting member evidently protrude into, and cause area loss within, the passage . . .
>
> The preamble to the independent claims, as well as other claim limitations, shed further light on the meaning of "stops . . . not obstructing."  The preamble to each independent claim states that the invention is an apparatus that "allow[s] ventilation" from an underground ventilation duct through a ventilation shaft to an atmospheric opening. Moreover, each independent clam recites "a support for arrangement in said shaft defining a passage between top and bottom openings of the support for *fluid communication* of said ventilation duct up through said support to said atmospheric opening." The foregoing guidance indicates that a fundamental

purpose of the invention is to allow ventilation when not in operation, and thus lends support to FloodBreak's construction.

*See FloodBreak, LLC v. Art Metal Indus., LLC*, No. 3:18-CV-503 (SRU), 2020 WL 4548084, at *9-*10 (D. Conn. Aug. 6, 2020) (internal citations omitted).

Here, the Court agrees with the explanation by the district court in the Connecticut Litigation.  Because any component that even minimally protrudes into a ventilating passage will necessarily restrict inhibit *some* flow of air, Defendants' proposed language attempts to read in limitations that are not apparent in the '342 Patent.  As the Federal Circuit has explicitly cautioned courts from engaging in such an exercise, Defendants' construction that the terms mean "not obstructing *any* airflow in said passage" must be rejected.

Accordingly, the Court construes the terms "not obstructing said passage" and "unobstructively horizontally spanning across said passage" as they appear in Claims 1, 4, 8, 10, 22, 23, and 24 of the '342 Patent as "not obstructing airflow in said passage."

### ii.    "An Axis Supported By And Horizontally Disposed Within Said Support"

Defendants finally contend that the phrase "an axis supported by and horizontally disposed within said support" contained in Claim 14 of the '342 Patent is indefinite.  Dkt. No. 41 at 27.  The crux of Defendants' argument is that an "'axis' cannot be 'supported by and horizontally disposed within said support,'" because "[a]n axis is [] 'the center of rotation' or 'a straight line around which a body rotates,' not a physical thing – that would be an 'axle.'"  *Id.* at 28.  Plaintiff disputes Defendants' argument and counters that the phrase has an ordinary and customary meaning to a person skilled in the art.  Dkt. No. 45 at 10.

Here, Defendants have failed to carry their burden in showing that the phrase "when read in light of the specification and the prosecution history, 'fail[s] to inform, with reasonable

certainty, those skilled in the art about the scope of the invention.'" *Interval Licensing*, 766 F.3d at 1369-70; *see Cox Commc'ns, Inc.*, 838 F.3d at 1228-29. Employing general claim construction principles, the language of Claim 14 states: "The apparatus of Claim 1 in which said one or more panels is hingedly rotatable on an axis supported by and horizontally disposed within said support." Dkt. No. 34-7 at 28. The language of Claim 14 does not shed light on construction of the phrase at issue.

Turning next to the patent's specification, which "is the single best guide to the meaning of a disputed term," *Vitronics*, 90 F.3d at 1582, Column 9 at lines 34-29 states:

> The *axis of axle* 32 and the vertical placement of stops 30 are coordinated relative to the thick- 35 ness of panels 34, 36 with their internal cross braces 139 such that when panels 34, 36 rotate gravitationally from vertical, the rotation is ended by stops 30 located where the panels will be horizontally disposed.

Dkt. No. 34-7 at 25 (emphasis added). When construing Claim 14 with the language of the specification, it is clear that the "axis" in the phrase "an axis supported by and horizontally disposed within said support" is the same "axis of axle 32" detailed in the specification, which rotates "from vertical" to the state where "the panels will be horizontally disposed." Indeed, and as explained by Plaintiff's expert, "[i]f the axle is supported by and horizontally disposed within said support, then so is the axis of that axle."[6]

Moreover, dictionary definitions of the word "axis" also support a finding that the phrase has an ordinary and customary meaning. *See Phillips*, 415 F.3d at 1314 ("[T]he ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent event to lay judges, and claim construction in such cases involves little more than the application of the widely

---

[6] Although it is true that the specification also notes "horizontal axle 232" in addition to "axle 32," *see* Dkt. No. 34-7 at 27-29, the discussion of "horizontal axle 232" is devoid of language characterizing it as being "supported by and horizontally disposed within said support." *Id.* Thus, the disputed phrase unequivocally pertains to "axle 32."

accepted meaning of commonly understood words[.]").  The Oxford English Dictionary supports Plaintiff's contention that an "axis" may be a physical thing, going so far as to defining the word as "[t]he axle of a wheel" in the first definition.  *See Axis*, The Oxford English Dictionary 838 (2d ed. 1989).  Definition 2b of in Merriam-Webster also states that an axis can be "any of various central, fundamental, or axial parts."  *See Axis*, Merriam-Webster's Collegiate Dictionary 87 (11th ed. 2003).  The Court is therefore not persuaded by Defendants' attempt to differentiate "axis" and "axle" as dictionary definitions confirm Plaintiff's position and the Court's finding that an axis can be a real, physical thing.[7]

And even if the Court accepts Defendants' argument that an axis "is not a physical thing," a person of ordinary skill in the art would not have trouble understanding the term.  Defendants stated at the *Markman* hearing that rotation in Claim 14 must be "around an axle, which is a physical thing."  Dkt. No. 68 at 74.  But the essence of the dictionary definitions of both "axle" and "axis" are uniform: the point around which rotation or revolution occurs.  *Compare Axis*, Merriam-Webster's Collegiate Dictionary 87 (11th ed. 2003) ("a straight line about which a body or a geometric figure rotates or may be supposed to rotate"); *Axis*, The Oxford English Dictionary 838 (2d ed. 1989) ("The geometrical line, by the revolution of a superficies about which, solids with circular section, as a globe, cylinder, cone, etc. are conceived to be generated"), *with Axle*, Merriam-Webster's Collegiate Dictionary 87 (11th ed. 2003) ("a pin or shaft on or with which a wheel or pair of wheels revolves); *Axle*, The Oxford English Dictionary 838 (2d ed. 1989) ("The centre-pin, or spindle upon which a wheel revolves, or which revolves along with it.").  A person

---

[7]   The Court notes that current definitions of "axis," as defined by Dictionary.com and the Cambridge Dictionary, further support the Court's finding.  *Axis*, Dictionary.com, https://www.dictionary.com/browse/axis (last visited Aug. 21, 2025) ("a central or principal structure, about which something turns or is arranged"); *Axis*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/axis (last visited Aug. 21, 2025) ("a real or imaginary straight line going through the center of an object that is spinning[.]").

with ordinary skill in the art therefore would not have difficulty understanding the meaning or scope of Claim 14.

Accordingly, the Court finds that the phrase "axis supported by and horizontally disposed within said support" contained in Claim 14 of the '342 Patent is not indefinite, but instead has a customary and ordinary meaning.

## IV.    <u>Conclusion</u>

For the foregoing reasons, the Court rules as follows on the claims contained in the '342 Patent:

"upright home position" as contained in Claims 1, 4, and 22-24 can be given its ordinary meaning by one skilled in the art;

"impetus" as contained in Claims 1 and 22 means "a force or cause";

"solely by gravitational impetus on its own weight" and "in gravitational rotation falling solely under the impetus of its own weight" as contained in Claims 1 and 22 can be given their ordinary meaning by one skilled in the art;

"gravitational rotation" and "gravitationally rotate" as contained in Claims 1 and 22-24 mean "the panels are mounted to rotate from a higher place to a lower place and fall using the force of gravity to rotate the panels downwardly";

"profile" as contained in Claims 1 and 22-24 means "the shape of a panel";

"not obstructing said passage" and "unobstructively horizontally spanning across said passage" as contained in Claims 1, 4, 8, 10, and 22-24 mean "not obstructing airflow in said passage"; and

"axis supported by and horizontally disposed within said support" contained in Claim 14 can be given its ordinary meaning by one skilled in the art.

Furthermore, pursuant to the Court's May 6, 2024 Discovery Plan and Scheduling Order, Plaintiff shall serve Fed. R. Civ. P. 26(a)(2) disclosures, if any, by September 20, 2025.

Defendants shall serve Fed. R. Civ. P. 26(a)(2) disclosures, if any, by November 4, 2025.

All discovery, including expert discovery, shall be completed by December 4, 2025.

The final date to take the first step in dispositive motion practice, if any, shall be January 3, 2026.

Dated: Brooklyn, New York     **SO ORDERED.**
   August 21, 2025

            _s/ Joseph A. Marutollo_
            JOSEPH A. MARUTOLLO
            United States Magistrate Judge