UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------x

FLOODBREAK, LLC,

                    Plaintiff,                    **MEMORANDUM & ORDER**
                                                  23-CV-6185 (EK)(JAM)

          -against-

T. MORIARTY & SON, INC. & JAMES P.
MORIARTY, JR.,

                    Defendants.

--------------------------------------x
ERIC KOMITEE, United States District Judge:

        Plaintiff FloodBreak has a patent for devices that are designed to prevent or mitigate flooding in subway systems.  The company brings this infringement action against T. Moriarty & Son ("TMS") and its president, James Moriarty.

        In 2016, the Metropolitan Transit Authority awarded TMS a lucrative contract to supply flood-mitigation devices and install them in the subway.  At the time, FloodBreak's patent was still pending.  TMS opted to install devices manufactured by a FloodBreak competitor called Art Metal Industries.  After TMS won the contract, but before installations began, FloodBreak's patent was granted.  Since then, Art Metal Industries' design has been established, in litigation elsewhere, to infringe FloodBreak's design.  TMS continued to install the infringing

devices, and get paid for the installations, even after it and Moriarty knew infringement was likely.

FloodBreak brings claims of direct patent infringement against TMS and infringement by inducement against Moriarty. The defendants move to dismiss, arguing that both claims are inactionable because any offer or sale was made before the patent was granted.  For the reasons set forth below, the motion is denied.

## I.   Background

We take the following facts from the Third Amended Complaint and the MTA's award letter to TMS — a document "integral to the complaint" — and assume them to be true in assessing the complaint.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005).  We also take judicial notice of the publicly available judicial filings in the litigation between FloodBreak and Art Metal Industries ("AMI").  *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004).

In October 2013, FloodBreak filed a provisional patent application for its mechanical closure device ("MCD") — a device it says can help prevent and mitigate flooding in subway systems.  Third Am. Compl. (Compl.) ¶ 10, ECF No. 73.  The device functions by shutting "ventilation openings at grade

2

level to allow existing below-ground pumps to clear subway tracks and facilities of standing water." *Id.* ¶ 1.

While the application was pending, FloodBreak and AMI discussed the possibility of collaborating in the fabrication and supply of MCDs. To that end, FloodBreak's founder, Louis Waters, had several meetings with AMI's CEO, Kevin Biebel. *Id.* ¶ 13. Among other things, Waters informed Biebel about the pending patent application and the prospect of sales to the MTA. *Id.* Per FloodBreak, the MTA "admired FloodBreak's solution so much" that it would require, in its request for proposals, that the winning contractor "install FloodBreak MCDs" or a device "equal" in performance. *Id.*

FloodBreak claims that, rather than collaborating, AMI used its design drawings to copy FloodBreak's invention. *Id.* ¶ 15. TMS then bid for the MTA contract involving MCD installation, using a very low pricing proposal for MCDs — submitted to them by AMI. *Id.* ¶ 16. FloodBreak had also sent a pricing proposal to TMS that included notice of the pending patent. *Id.* ¶ 18.

The MTA awarded TMS the contract on September 7, 2016, and Moriarty signed the award letter the following day. *Id.* ¶ 19. The award letter did not specify which MCDs would be used. Instead, the contract expressly required the installation

3

of MCDs that were manufactured by FloodBreak or "equal" to FloodBreak's. *Id.* ¶¶ 13, 20; *see* Award Letter, ECF No. 55-1.

TMS then asked the MTA to approve AMI's device as "equal" to FloodBreak's, but the MTA denied that application. *Id.* ¶ 21. Following this setback, Moriarty met with Waters to discuss the possibility of using FloodBreak's MCDs. *Id.* ¶ 22. At this meeting, Moriarty "complained" about FloodBreak's pricing, which he "believed" to be forty-seven percent higher than AMI's. *Id.* Given this price difference, TMS continued working with AMI, at Moriarty's instruction, to get AMI's MCDs approved. *Id.* ¶ 23.

In the end, "Moriarty decided to stay with AMI." *Id.* With the patent infringement issue in the background, Moriarty told Waters, "Well, you're just going to have to sue me." *Id.* The MTA ultimately approved AMI's devices as equal to FloodBreak's. As a result, TMS "issued a purchase order for AMI to supply approximately 398 MCDs for eventual installation and sale to the MTA under Contract E-31689." *Id.* ¶¶ 24-25.

FloodBreak's patent was granted on September 5, 2017. *Id.* ¶ 26. Shortly thereafter, an MTA construction manager told TMS's project manager that FloodBreak was suing AMI for patent infringement. *Id.* ¶ 33. The MTA requested that TMS release the design drawing it received from AMI to FloodBreak, but AMI did not permit TMS to do so. *Id.*

4

In 2018, FloodBreak sued AMI for patent infringement in the District of Connecticut.  Moriarty and his project manager were deposed in the case.  *Id.* ¶ 37.  That court determined infringement was "likely," and the parties ultimately settled, stipulating that AMI's device did infringe FloodBreak's patent.  *Id.* ¶¶ 39-41.  In July 2022, the court entered judgment for FloodBreak.  *Id.* ¶¶ 39, 40.

Between 2018 and 2020, TMS's subcontractor completed its obligations under the MTA contract, resulting in the installation of hundreds of individual AMI MCDs in the New York subway system.  *Id.* ¶¶ 29-31.  The MTA paid TMS after each installation.  *Id.* ¶ 32.

In August 2023, FloodBreak filed this action.  *See* ECF No. 1.  They bring claims of direct patent infringement against TMS and infringement by inducement against Moriarty.

## II.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead facts sufficient "to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.[1]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

---

[1] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

5

alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013). At the same time, we are "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.

### III. Discussion

### A.   Direct Infringement

FloodBreak claims TMS directly infringed the patent by offering to sell and selling AMI's MCDs to the MTA. Direct infringement occurs when someone "without authority makes, uses, offers to sell, or sells any patented invention . . . during the term of the patent." 35 U.S.C. § 271(a). A defendant can only be liable for infringement for offers and sales that occur after the patent was granted. *Id.; State Indus., Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1237 (Fed. Cir. 1985).

Here, defendants move to dismiss on the basis that any offer to sell and sale at issue occurred prior to the patent's issuance, and therefore were not infringing. This timeline, they say, arises from the face of the complaint itself, which indicates that the MTA awarded the contract at issue to TMS on September 7, 2016 — "almost exactly one year before" the patent issued. Defs.' Mem. of L. in Supp. of Mot. to Dismiss 2, ECF

6

No. 54; *see also id.* at 8 ("[T]he sale occurred when the MTA awarded [the contract] to TMS on September 7, 2016.").

Plaintiff responds that, as the complaint itself pleads, TMS only "began selling MCDs to the MTA in 2018."  Pl.'s Mem. in Opp'n to Mot. to Dismiss 6, ECF No. 56 (citing ECF No. 36; Second Am. Compl. ¶¶ 12, 16-20).  This is the case, plaintiff argues, because TMS "worked well into 2017" to get the MTA's approval for the use of AMI's device, *id.* at 7 (citing Second Am. Compl. ¶ 23); and AMI thereafter fabricated and delivered 398 MCDs "during 2018."  Compl. ¶ 25.

The Patent Act does not define "sell" or "sale."  At oral argument, the Court called for supplemental letters on whether and how the subcontractor's installations might affect TMS's potential liability, among other questions.  Hr'g Tr. 41:9-21, ECF No. 80.

In response, the defendants continue to press the argument that the "sale" of the devices at issue was complete upon the execution of the MTA contract.  *See* Defs.' Letter at 1, ECF No. 84.  The case law, however, does not support this contention.  Federal Circuit precedent makes clear that "sales" can — and often will — occur across multiple points in time, including not only at the execution of a contract of sale, but also upon the delivery of the goods in question.

7

1.    <u>Sales May Occur at Multiple Points in Time</u>

Even if part of the sale in question occurred prior to a patent's issuance, the sale may continue after the patent's issuance.  In *Litecubes*, the Federal Circuit considered the *place* of sale in determining personal jurisdiction.  *Litecubes, LLC v. N. Light Prods., Inc.*, 523 F.3d 1353, 1369-70 (Fed. Cir. 2008).  The court concluded that the sale occurred at the "location from which the goods were shipped" *and* "at the location of the buyer."  *Id.*  Assuming there was some distance between these two places, the sale must (by definition) have occurred at multiple points in time.

Likewise, in *North American Philips*, the Federal Circuit acknowledged that a sale can occur at multiple places: "it is possible to define the situs of the tort of infringement-by-sale either in real terms as *including* the location of the seller *and* the buyer *and* perhaps the points along the shipment route in between."  *N. Am. Philips Corp. v. Am. Vending Sales, Inc.*, 35 F.3d 1576, 1579 (Fed. Cir. 1994) (emphases added).  Indeed, the very cases that defendants argue control here compel the same conclusion.  In *Transocean*, the court held that although a "contract *can* constitute a sale to trigger infringement liability," a "sale" can *also* comprise a "transfer of tangible property."  *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1311 (Fed.

Cir. 2010) (emphasis added).  Under *Transocean*'s terms, the MTA award letter is not the only possible "sale" as a matter of law. *Enercon* confirms the same.  That court relied on the definitions of sale in *Black's Law Dictionary* and *Webster's Dictionary*. *Enercon GmbH v. U.S. Int'l Trade Comm'n*, 151 F.3d 1376, 1381-82 (Fed. Cir. 1998) (emphasis added).  Payment and physical transfer of property need not happen at the same time — but both comprise part of a "sale."

The defendants contend that these cases determining *where* a sale occurred for purposes of Section 271 are not relevant to our inquiry of *when* the sale in question occurred. But they have articulated no logical reason why this distinction carries a meaningful difference, and the court sees none.  On the contrary, space and time are logically linked, as they are in the cosmos.[2]  Therefore, facts that suggest part of a sale may have occurred *before* the patent's issuance do not foreclose FloodBreak's assertion that part of a sale may also have occurred *after* its issuance.

---

[2] "Time and space and gravitation have no separate existence from matter." – widely attributed to Albert Einstein.  *See* Frank Giustra, Opinion, *If We Could Unify Quantum Mechanics with General Relativity, It Would Change Everything.  That's the Modest Goal of the Newly-Launched Quantum Gravity Institute*, Toronto Star (July 19, 2022), https://perma.cc/WV6L-42YM.

2.    FloodBreak Has Plausibly Alleged Post-Issuance
Sales

The defendants' second argument is that, even if a sale can occur over a course of time, the plaintiff has not alleged any post-issuance conduct by the defendants that would amount to part of a sale.  Because the MCDs were delivered from a subcontractor rather than TMS, they claim that TMS cannot be held liable.  In their view, if they never had possession of the MCDs, they never held title, and therefore cannot have "sold" AMI's MCDs to the MTA.

There are three problems with this argument.  First, the complaint *does* allege a post-issuance "sale" by TMS.  *See, e.g.*, Compl. ¶¶ 29-32, 45-46.  The complaint plausibly describes deliveries, installations, and payments occurring after the patent was granted.  *Id.*  Granted, *some* of this conduct emerges from the complaint primarily by inference: for example, Paragraph 45(a) alleges that TMS itself "chose[] to buy" infringing devices "after" early 2018, and one can plausibly infer that the sale to the MTA could occur only after TMS obtained the devices in the first place.  Combined with the complaint's extensive recitation of TMS's interactions with FloodBreak and AMI, this is sufficient at this stage.

Second, to the extent a *subcontractor* completed the deliveries and installations of the infringing devices after the

10

patent was granted, the complaint easily supports the inference that they did so as TMS's agent.  For instance, the complaint alleges that TMS maintained records of all deliveries and installations and received the resulting payments.  Compl. ¶¶ 29-32.  A principal is liable for the infringing actions of its agent within the scope of an agency relationship or when it "contracts with another" and profits from the infringement — which is exactly what is alleged here.  *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022-23 (Fed. Cir. 2015) (en banc) (per curiam); *Berall v. Pentax, Inc.*, No. 10-CV-5777, 2021 WL 3934200, at *3 (S.D.N.Y. Sep. 2, 2021); *see generally Uni-Systems, LLC v. United Tennis Ass'n*, 350 F. Supp. 3d 143, 163 (E.D.N.Y. 2018) (denying motion to dismiss infringement claims against "lead designer and official project architect" that "reviewed and approved" allegedly infringing roof design).  Therefore, the allegations regarding the subcontractor's conduct are attributable to TMS.

Third, TMS's theory that the September 2016 contract reflects a completed sale suffers from a fatal flaw: the contract was agnostic as to which MCDs TMS would install.  All it required was the installation of *FloodBreak's* device or its "approved equal."  Compl. ¶¶ 13, 20.  When Moriarty signed the MTA's award letter, Moriarty was not contractually committed to using AMI's MCDs, despite using their pricing in the bid.  *See*

11

*id.* ¶¶ 13, 20, 27-28.  It cannot be that the "sale" in question was completed before the product to be sold had even been selected.

The motion to dismiss the direct infringement claim is therefore denied.

## B.   Infringement by Inducement

The defendants next move to dismiss the claim of infringement by inducement against Moriarty for two reasons. First, they claim that because direct infringement is impossible, so is inducement.  Second, they claim Moriarty neither had knowledge of direct infringement by TMS nor an intent to induce TMS's infringement.  Because the direct infringement claim survives, we address only their second argument.

An infringement by inducement claim "must be predicated on direct infringement."  *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 920-21 (2014).  Here, that predicate is plausibly pled.  *See supra* Section III.A.  To survive a motion to dismiss, a plaintiff must plausibly allege that the defendant: "(1) had knowledge of the patent-in-suit; (2) knew the induced acts were infringing; and (3) specifically intended to encourage another's infringement."  *Carson Optical Inc. v. eBay Inc.*, 202 F. Supp. 3d 247, 253 (E.D.N.Y. 2016)

12

(citing *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 639 (2015)).  All three requirements are satisfied here.

### 1.    Knowledge of the Patent

FloodBreak adequately alleges Moriarty's knowledge of its patent.  "[T]he filing of a federal complaint identifying the patents-in-suit satisfies the requirement that a plaintiff plead a defendant's knowledge of the patents-in-suit."  *Carson*, 202 F. Supp. 3d at 254.  Moriarty is alleged to have known of FloodBreak's patent, at the latest, by February 2019, when he was deposed in FloodBreak's infringement suit against AMI. Compl. ¶ 38.  Despite this, his company continued performance under the MTA contract, and installations of MCDs continued into 2020.  *Id.* ¶ 31.

Further, Moriarty was personally involved in overseeing the performance of TMS's contract with the MTA. Compl. ¶ 48.  And TMS, his own company, "had explicit notice of the '342 patent no later than October 2017, when the MTA's construction manager asked [TMS] for a copy of AMI's design drawings and informed it that FloodBreak was suing AMI for patent infringement."  *Id.* ¶ 45.  Moriarty therefore knew of the patent.

### 2.    Knowledge of Infringement

The knowledge element can be satisfied by plausible allegations of either actual knowledge or willful blindness.

13

*Carson*, 202 F. Supp. 3d at 254-55.  Willful blindness requires that the "alleged inducer (1) subjectively believe that there is a high probability that a fact exists and (2) take deliberate actions to avoid learning of that fact." *Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1373 (Fed. Cir. 2015).  At a minimum, FloodBreak has plausibly alleged Moriarty's willful blindness.

As to subjective belief, in a face-to-face meeting, Moriarty told Waters, "Well, you're just going to have to sue me."  Compl. ¶ 49.  Subsequently, "Moriarty learned from Biebel that FloodBreak had accused AMI of infringing FloodBreak's patent on its MCD design."  *Id.*  Moriarty was the President of TMS.  His involvement in getting AMI's MCDs approved as "equal" to FloodBreak's and the subsequent performance of the contract all suggest he understood the infringement risk clearly.  *See* Compl. ¶ 49.  These facts, taken together, are sufficient to allege that Moriarty had a subjective belief that there was a high probability of infringement.

As to avoidance, allegations that someone on notice of potential infringement did nothing to investigate are sufficient at this stage.  *See Info-Hold*, 783 F.3d at 1373; *Carson*, 202 F. Supp. 3d at 258.  FloodBreak alleges that in October 2017, the MTA construction manager, upon learning of possible infringement, asked TMS to release AMI's design drawings to FloodBreak.  *Id.* ¶ 33.  And when AMI's CEO declined to grant

14

permission to release the designs, "Moriarty . . . chose to pretend FloodBreak had not raised serious questions about whether AMI had pirated FloodBreak's patented MCD design and persisted long after issuance of the '342 patent."  *Id.* FloodBreak further claims that Moriarty then did nothing to investigate whether AMI's MCDs were infringing.  *Id.* ¶ 34-35.

    3.    <u>Intent to Induce Infringement</u>

At the motion-to-dismiss stage, plausible factual allegations about the defendant's mental state "must be taken as true" to satisfy the intent prong.  *AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 46 (Fed. Cir. 2024).  As discussed above, FloodBreak alleges detailed facts that Moriarty knew about the patent and probability of infringement, but nevertheless continued to oversee the MTA contract installing infringing devices.  *See supra* Section III.B.1-.B.2.  Allegations that "defendants knew of the existence of [a patent] and continued to sell a product that infringed it are sufficient to meet the intent requirement at the pleadings stage."  *Paone v. Broadcom Corp.*, No. 15-CV-596 et al., 2015 WL 4988279, at *13 (E.D.N.Y. Aug. 19, 2015).

Given that the three requirements for inducement of infringement are satisfied, the motion to dismiss is denied.

## IV. Conclusion

For the foregoing reasons, defendants' motion to dismiss is denied. The Court has reviewed the parties' pre-motion letters concerning the anticipated motions for summary judgment and has determined that a pre-motion conference is not necessary. The motions shall be briefed as follows: both parties to serve their motions for summary judgment by April 27; oppositions by May 26; and replies by June 5. Each submission should follow the page limits in Rule III.D of the Court's Individual Rules and Practices and should be made in a single brief. As a courtesy to the Court, the parties are encouraged not to file their motion papers and submit courtesy copies until the motion has been fully briefed, unless doing so might cause a party to miss a statutory deadline. *See* Rule III.C.2 of this Court's Individual Rules and Practices.

SO ORDERED.

_/s/ Eric Komitee_
ERIC KOMITEE
United States District Judge

Dated:    March 30, 2026
          Brooklyn, New York

16